This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37851**

**LISA CANAS,**

Worker-Appellant,

v.

**DRIVELINE HOLDINGS INC.
and TECHNOLOGY INSURANCE
COMPANY,**

Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION
Anthony "Tony" Couture, Workers' Compensation Judge**

James Rawley
Albuquerque, NM

for Appellant

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Appellees

## MEMORANDUM OPINION

**VARGAS, Judge.**

**{1}** Worker Lisa Canas appeals from the Workers' Compensation Judge's (WCJ) order granting partial compensation, while denying other benefits, against Employer Driveline Holdings, Inc. Concluding that there is substantial evidence to support the WCJ's findings and that there was no error, we affirm.

## BACKGROUND

**{2}**     Worker was an employee of Employer on May 26, 2016, when she fell at work and landed on her right knee (the May 2016 accident). Following the May 2016 accident, Worker sought medical treatment for injuries to her right knee, lower back, groin, and hip, and counseling for her mental injuries from various health-care providers. Worker filed for workers' compensation benefits in October 2017, seeking temporary total disability benefits and compensation for the loss of use of her knee, lower back, groin, and hip, primary and secondary medical benefits for her mental injuries, and reimbursement for related medical bills. The parties stipulated that the May 2016 accident arose out of and was reasonably incident to Worker's employment and that Worker's injury to her right knee was caused by the accident. A hearing was held on October 26, 2018, and the WCJ entered a compensation order in December 2018, granting Worker temporary total disability benefits for any period she was unable to work from May 26, 2016, to August 28, 2018, scheduled injury benefits for her right knee at a rate of twenty percent of her pre-injury salary for 150 weeks, and continued treatment for her secondary mental health injuries, but denied medical benefits for past and future treatment that Worker received and will receive for her claimed lower back, hip, and groin injuries, and for those medical services incurred by Worker from unauthorized health-care providers. This appeal follows.

## DISCUSSION

**{3}**     On appeal, Worker raises the following arguments: (1) the WCJ erred in determining that Worker's injury resulted in only a twenty percent loss of use to her knee; (2) the WCJ erred in finding that Worker's mental condition was at maximum medical improvement (MMI) and only awarding temporary benefits; (3) the WCJ erred in finding that Worker failed to prove that the claimed injury to her back, groin, and hip were caused by the accident; (4) the WCJ erred when it denied Worker's request for an MRI with contrast, as it was reasonable and necessary to Worker's medical care; (5) the WCJ's denial of reimbursement for medical bills incurred by her chosen medical providers for Worker's past secondary mental injures was in error.

## I.     Standard of Review

**{4}**     "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Pro.*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. "We will affirm the [Workers' Compensation Administration's (WCA)] decision if, after taking the entire record into consideration, there is evidence for a reasonable mind to accept as adequate to support the conclusion reached." *Id.* (internal quotation marks and citation omitted). "The [WCA's] findings will not be disturbed so long as they are supported by substantial evidence on the record as a whole." *Tallman v. ABF* (*Arkansas Best Freight*), 1988-NMCA-091, ¶ 15, 108 N.M. 124, 767 P.2d 363. "Whole record review is not an excuse for an appellate court to reweigh the evidence and replace the fact finder's conclusions with its own." *Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 10, 111 N.M. 550, 807 P.2d 734.

**{5}** To the extent we are asked to interpret the Workers' Compensation Act (the Act), "[w]e review the interpretation of a statute de novo" and "consider the Act in its entirety, constructing each section in connection with every other section." *Molinar v. Larry Reetz Constr., Ltd.*, 2018-NMCA-011, ¶ 19, 409 P.3d 956 (internal quotation marks and citation omitted).

## II.      Worker's Right Knee Injury

**{6}** Worker contends she is entitled to reversal of the WCJ's compensation order regarding her claim for loss of use of her right knee on two separate grounds. First, Worker contends that the WCJ misapplied the law and this Court should remand with "guidance, some standards, some factors, against which to measure [Worker's] claim" for loss of use. Next, Worker contends the WCJ erred in finding that Worker suffered a twenty percent loss of use of her knee, ignoring the evidence Worker offered that showed a loss of use closer to seventy-five percent.

**{7}** NMSA 1978, Section 52-1-43 (2003) provides for the compensation of workers who suffer accidental injuries to specific body members. Section 52-1-43(B) provides:

> For a partial loss of use of one of the body members or physical functions listed in Subsection A of this section, the worker shall receive compensation computed on the basis of the degree of such partial loss of use, payable for the number of weeks applicable to total loss or loss of use of that body member or physical function.

Thus, the WCJ must determine the "basis of the degree" of Worker's loss of use in order to compute the compensation to which Worker is entitled. *See Roybal v. Chavez Concrete & Excavation Contractors, Inc.*, 1985-NMCA-020, ¶ 10, 102 N.M. 428, 696 P.2d 1021 (requiring the WCJ to enter a "specific percentage of loss of use as the degree of such partial use" as the term is used in Section 52-1-43(B) (internal quotation marks and citation omitted)).

**{8}** We first address Worker's argument that the WCJ misapplied the law when it calculated Worker's loss of use of her right knee at twenty percent. Worker argues that substantial evidence does not exist to support the WCJ's decision, and asks us to develop standards and factors against which the WCJ should measure her claim for "loss of use," as the term is used in Section 52-1-43(B). Indeed, this Court has previously considered whether specific standards are required by Section 52-1-43(B) and has declined to impose them. *See Lucero v. Smith's Food & Drug Ctrs., Inc.*, 1994-NMCA-076, ¶ 11, 118 N.M. 35, 878 P.2d 353 ("The absence of a requirement of reference to the AMA guides has not historically prevented determinations of percentage loss of use. . . . [W]e hold that evidence of that specific character is not required under Section 52-1-43 as that section currently exists."). In this instance, beyond her claim that her percentage of loss of use should have been greater, Worker fails to explain how the WCJ misapplied the law and why we should revisit our holding in *Lucero* that the lack of medical guidelines does not prevent a WCJ from determining

the percentage of loss of use. *See id.*; *see also State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments). Further complicating our review, Worker has not explained what considerations we should take into account in developing the standards and factors she requests and fails to explain how they should be applied. Absent any authority or a clearly developed argument to depart from precedent, we decline to do so. *See Guerra*, 2012-NMSC-014, ¶ 21.

**{9}** We now turn to Worker's argument that the WCJ's finding that Worker suffered a twenty percent loss of use to her knee was not supported by substantial evidence. Worker contends that her testimony in her deposition and at trial, the testimony of Dr. Evan Knaus, and the notes from her physical therapist, Mary Beth Plummer, support her contention that she suffered severe limitations on the use of her leg. This evidence on whole record review, she claims, supports a conclusion that her percentage of loss of use of her right knee was seventy-five percent.[1]

**{10}** Initially, we note that Worker contends that she is no longer able to perform her job and "[t]his reduction in the spectrum of job opportunity is relevant to loss of use." As we consider the available evidence "[i]n evaluating the loss of use, . . . it is not necessary to consider the occupation of the worker and how the loss of the specific member of the body may affect his or her ability to perform the duties of his or her job." *Torres v. Plastech Corp.*, 1997-NMSC-053, ¶ 24, 124 N.M. 197, 947 P.2d 154 (internal quotation marks and citation omitted). Therefore, for purposes of our review, we do not consider Worker's testimony that she is not able to perform her job duties, except to the extent that the testimony explains the limitations in her ability to use her right knee. Further, we must consider the WCJ's finding in light of the whole record, not merely evidence offered by Worker, and we hold that there is substantial evidence to support the WCJ's finding. *See Leonard*, 2007-NMCA-128, ¶ 10 ("Whole record review contemplates a canvass by the reviewing court of all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result. We may not substitute our judgment for that of the administrative agency[.]" (alterations, internal quotation marks, and citations omitted)).

**{11}** Prior to the hearing, the parties made various stipulations in a pre-trial order, including that "the right knee injury that . . . Worker suffered in her May 26, 2016 accident reached [MMI] on March 16, 2017[,]" that the injury should be "assigned a two percent (2%) permanent impairment to the right lower extremity," and that Worker was

---

[1]We note that while Worker briefly refers to the evidence presented at trial, we remind her that she is obligated to provide this Court a detailed explanation of the substance of the evidence she asks us to consider in our whole record review of her substantial evidence claims, including citations to the record. *See* Rule 12-318 (A)(3) NMRA ("A contention that a . . . judgment . . . is not supported by substantial evidence shall be deemed waived unless the summary of proceedings includes the substance of the evidence bearing on the proposition."); *see also State ex rel. Foy v. Vanderbilt Cap. Advisors*, 2022-NMCA-026, ¶ 28, 511 P.3d 329 (stating that where an appellant does not properly attack a district court's finding, they are bound by those findings where the letter or spirit of the Rules of Appellate Procedure require that an appellant properly set forth all the evidence bearing upon the findings).

paid loss of use benefits at the two percent rate from March 17, 2017, to the present date.

**{12}** The evidence presented at trial was that immediately following the May 2016 accident, Worker sought medical treatment from Physician's Assistant Pamela Burks, at Presbyterian Hospital, who examined Worker in June 2016, noting that there was "extensive swelling over the joint with accompanying ecchymosis" but that "there [was] no erythema or signs of infection." Following an MRI of the knee, Ms. Burks again noted that Worker had a sizable subcutaneous hematoma in the anterior and medial aspects of the knee, but that there were no new fractures or meniscal or ligamentous injuries, with an essentially normal MRI of the right knee. Worker continued to see Ms. Burks through August 2017, with continued complaints of pain in her right knee and loss of strength, but Ms. Burks did not note any major injuries related to Worker's right knee.

**{13}** Additionally, Dr. Knaus, who conducted an independent medical examination (IME) of Worker in July 2017 to establish an impairment rating for Worker, testified in his deposition that Worker was diagnosed with a "right knee contusion with resolved hematoma" but that there were no other signs of serious injury like internal tendon problems, articular surface problems, meniscal problems, fractures, other issues requiring knee surgery, deep vein thrombosis, or blood clotting.

**{14}** During his physical examination of Worker, Dr. Knaus observed that Worker was "[c]omfortable, [suffering] no apparent distress, pleasant and cooperative" and "[d]emonstrate[d] no difficulty with transitioning from sitting to standing, supine to sitting, or on/off the examination table, which she performed independently." Worker, however, complained of a pain rating of seven out of ten during the examination. Dr. Knaus noted that Worker's lower extremity motor examination was normal, as was her flexion contracture. Her right knee, he reported, showed some atrophy.

**{15}** Dr. Knaus also reviewed Worker's medical history, noting that her X-ray following the injury revealed "[t]here is prominent soft tissue swelling in the anterior and medial knee region" but "[t]here is no evidence of acute fracture or dislocation. No bony erosions or sclerotic lesions are seen. Joint spaces are preserved. No evidence of knee joint effusion is seen." Dr. Knaus also noted that Worker received physical therapy from June 2016 through December 2016, when she was discharged from treatment, with improvement in her pain levels, a range of motion of 0 to 135 degrees, and a 5/5 strength rating. Dr. Knaus testified that an MRI conducted in February 2017 identified a bone marrow anomaly, but that it was an underlying hematological problem that was unexplained by the May 2016 accident.

**{16}** Based on his physical examination of Worker and a review of her medical records, Dr. Knaus concluded that her diagnosis supported the two percent impairment rating and Worker reached MMI for her right knee on March 16, 2017.

**{17}** Dr. Christopher Patton also conducted an IME of Worker in September 2018. Dr. Patton testified that, although Worker complained of continued pains to her right knee,

his examination and MRI did not show that "there was any specific pathology to the posterior cruciate ligament," which would be present if the ligament were damaged. Additionally, Dr. Patton stated that he did not see any ongoing swelling of the knee joint, problems with the meniscus or ligaments, or fractures. The hematoma caused by Worker's fall had resolved, though Worker complained of ongoing symptoms. Worker advised during Dr. Patton's examination that she was able to walk on a treadmill and ride an exercise bike. Dr. Patton noted that Worker's physical therapy records indicated instances of a gait deficit and some difficulty kneeling. Following his examination of Worker, Dr. Patton did not impose any functional restrictions on Worker's use of her right knee, though he conceded that Worker's activities may be limited, depending on the amount of pain she was experiencing at any given time. Dr. Patton stated explicitly that "[t]here are no objective findings that I have that require restrictions for her right knee."

{18}    In her deposition and at the hearing, Worker testified that the injury to her right knee limited her to sedentary duty, requiring her to find another job. She explained that she continued to experience pain and instability in her right knee and did not have full use of her leg, with limitations on her ability to bend and kneel. Worker testified that she suffered lifestyle changes as a result of her injury, including no longer being able to walk to her mother's home, go hiking, or go to the gym in the same way she did before the accident. Worker also testified that she is still able to walk on a treadmill and ride a bike, attend to her household chores, walk her and her mother's dogs, and care for her mother. Worker acknowledged that any restriction to her lifestyle was not ordered by a health-care provider.

{19}    Following the hearing, the WCJ found that "[b]ased upon the totality of the evidence, including the medical evidence, Worker's testimony, and the [c]ourt's observations of . . . Worker, Worker suffers a [twenty percent] loss of use for her right knee injury."

{20}    To be sure, the evidence presented to the WCJ indicates that Worker continues to suffer from pain that limits the use of her knee. Notwithstanding the pain, Worker continues to be able to perform her day-to-day activities, including walking on a treadmill, riding an exercise bike, attending to her household chores and taking care of her ailing mother. Further, as the testimony of both Dr. Knaus and Dr. Patton makes clear, Worker does not suffer from ongoing swelling of the knee joint, or structural damage to her knee. Taking into account Worker's testimony, as well as the testimony of the various health-care providers and Worker's medical records, and keeping in mind our whole record standard of review, we cannot conclude that the WCJ's finding that Worker suffered a twenty percent loss of use as a result of her injury is in error. *See Herman*, 1991-NMSC-021, ¶ 10.

### III.    Worker's Secondary Mental Injuries

{21}    Next, Worker argues that substantial evidence does not support the WCJ's findings that Worker merely suffered a temporary exacerbation of her mental condition

and that Worker reached MMI for her secondary mental injuries. Worker contends that the evidence supports a finding of permanent secondary mental health benefits and disputes that she reached MMI as to her mental injuries.

{22}   At trial, the parties presented evidence regarding Worker's psychological condition in the form of the deposition testimony and report of Dr. Rex Swanda, a board certified and licensed neuropsychologist. Dr. Swanda performed an independent neuropsychological evaluation of Worker and submitted a report on his evaluation.

{23}   Dr. Swanda testified that, as part of his examination, he reviewed Worker's prior mental health history, which included past complaints of anxiety and an October 2015 diagnosis of adjustment disorder with mixed anxiety and depressed mood, as well as a "past history of depression when she was living in California in about [the] year 2000[.]" Dr. Swanda noted that Worker first sought treatment for psychological symptoms related to the May 2016 accident in the spring of 2017. Ten months later, Worker was diagnosed with adjustment disorder with depressed mood secondary to social and medical issues in March 2018, prescribed twenty milligrams of Prozac, and provided with a recommendation that she participate in counseling every three weeks to cope with stress. In the psychotherapy sessions leading up to her March 2018 diagnosis, Worker complained about multiple stressors, including her mother's behavior and progressing dementia, guilty feelings about her ex-husband's suicide, her knee injury and having to work with a lawyer regarding workers' compensation issues, issues related to her son's drinking and behavior, anger with her brother for his failure to help with their mother, and problems with her relationship with her boyfriend.

{24}   At the conclusion of his examination, Dr. Swanda opined that to a reasonable degree of medical probability, "the mood symptoms associated with the diagnosis of [a]djustment [d]isorder with mixed anxiety and depressed mood are causally related to the 5/26/2016 work injury." Dr. Swanda went on to conclude that "these mood symptoms are only one of at least four major stressors that have been a focus of the counseling sessions." He explained that, in his opinion, "it is more likely than not that the chronic pain and discomfort associated with the 5/26/2016 work injury did result in an 'exacerbation' of pre-existing mood problems/condition." Further, Worker's "present mood disorder is not a permanent condition but is a temporary condition that is due to multiple stressors that include the chronic pain and discomfort that is associated with the 5/26/2016 work injury." Dr. Swanda concluded that Worker reached MMI for her mental injures on August 28, 2018, and her mental injuries could be reasonably and sufficiently treated with medication and twelve additional counseling sessions.

{25}   Based on the evidence presented, the WCJ specifically found that "Worker suffers from an exacerbation of her preexisting mental disorder" and that "Worker reached psychological MMI on August 28, 2018." Worker argues that the WCJ's findings are not supported by substantial evidence, arguing that Dr. Swanda's testimony in fact supports "inclusion of her mental injury in the assessment of her physical injury" and disputes that Worker was at MMI. We are not persuaded. Dr. Swanda gave uncontroverted testimony that the May 2016 accident temporarily exacerbated Worker's

preexisting mental health conditions and that she reached MMI as to those mental injuries on August 28, 2018. Worker does not direct this Court to any evidence that would contradict Dr. Swanda's report or provide evidence that Worker suffered a permanent mental injury. Therefore, we hold that there is substantial evidence to support the WCJ's finding that Worker's underlying mental injuries were only temporarily exacerbated by the May 2016 accident and that she reached MMI on August 28, 2018. Because of this holding, we need not address Worker's claim of permanent indemnity benefits for her mental injuries.

**{26}** Worker also argues that it was an abuse of discretion for the WCJ to not award an impairment rating for her mental injuries. Worker failed to point us to the location in the record where this issue was raised below, and it was not addressed in the WCJ's compensation order. Our review of the record disclosed that the pretrial order listed among the contested issues, the issue of "[w]hether . . . Worker suffered a permanent impairment to a non-scheduled body member . . . and, if so, whether . . . Worker is entitled to any permanent partial disability benefits as a result thereof[.]" However, we found nothing in Worker's proposed findings of fact and conclusions of law or in the argument at trial requesting such relief. *See Crownover v. Nat'l Farmers Union Prop. & Cas. Co.*, 1983-NMSC-099, ¶ 12, 100 N.M 568, 673 P.2d 1301 (holding that absent a requested finding of fact and conclusion of law on a matter at issue, the issue is waived and not preserved for appeal). We therefore decline to address the matter. *See State v. Leon*, 2013-NMCA-011, ¶ 33, 292 P.3d 493 ("We generally do not consider issues on appeal that are not preserved below." (internal quotation marks and citation omitted)); Rule 12-321(A) NMRA ("To preserve an issue for review it must appear that a ruling or decision by the trial court was fairly invoked.").

## IV.    Worker's Claims for Lower Back, Hip, and Groin Injuries

**{27}** Worker next argues that the WCJ's finding that Worker failed to prove that her claimed low back and right hip/groin problems were causally related to the May 2016 accident is not supported by substantial evidence. Worker contends that the evidence supports her claims that her injuries related to her lower back, hip, and groin were caused by the May 2016 accident, arguing that the WCJ improperly disregarded Dr. Patton's conclusions in favor of Dr. Knaus's conclusion.

**{28}** Dr. Knaus testified that, as part of his examination of Worker, he had examined Worker's low back, which was entirely normal except for some tenderness, and concluded that there was no significant injury to the lower back area. He also noted that in reviewing Worker's medical records, Worker did not complain of any lower back pain until November 2016 and that he could not medically establish a causal relationship between the lower back pain and the May 2016 accident. Additionally, Dr. Knaus testified that he examined Worker's right hip and found that Worker did not exhibit any hip or groin pain and X-rays of Worker's lower back and hips appeared relatively normally. He specifically concluded that, based upon the medical records and his examination of Worker, he could not conclude the lower back, hip, and groin injuries were causally related to the May 2016 accident.

**{29}** Likewise, Dr. Patton testified that there was no documentation of lower back complaints until approximately November 2016 and no complaints regarding her right hip until December 2016. In his report, Dr. Patton concluded that, in his professional opinion, Worker's "low back and right hip symptoms would be considered causally related to the May 26, 2016, date of injury in that the mechanism of injury could probably cause the symptoms, as well as her altered gait from the right knee. At his deposition, however, Dr. Patton testified that based purely on a temporal timeline from when the accident occurred on May 26, 2016, to when Worker reported her lower back and hip injuries, he could not state to a reasonable degree of medical probability that the lower back and hip injuries were causally related to the May 2016 accident.

**{30}** The WCJ found that "[t]he opinions of Dr. Knaus related to causation of . . . Worker's groin/hip/back injury are persuasive, credible, and adopted by [the WCJ]" but that he "did not find the testimony of Dr. Patton in relation to [the] causation of the groin/hip/back injury to be persuasive[,]" concluding that Worker did not prove her lower back and right hip injuries were caused by the May 2016 accident. The WCJ is free to "reject expert opinion evidence in whole or in part," *Chapman v. Jesco, Inc.*, 1982-NMCA-144, ¶ 3, 98 N.M. 707, 652 P.2d 257, and "weigh the testimony, determine the credibility of the witnesses, reconcile inconsistent statements of the witnesses, and determine where the truth lies." *Bower v. W. Fleet Maint.*, 1986-NMCA-091, ¶ 23, 104 N.M. 731, 726 P.2d 885. This Court will not reweigh the evidence or second-guess the WCJ. *See Leonard*, 2007-NMCA-128, ¶ 20 ("Although on appeal we take the whole record in account, we do not reweigh the evidence."). Therefore, given the conflict in Dr. Patton's testimony, and that Dr. Knaus offered evidence that a reasonable mind could accept as adequate to support the WCJ's conclusion, we hold that there is substantial evidence to support the WCJ's finding that Worker's lower back, hip, and groin injuries were not causally related to the May 2016 accident. *See id.* ¶ 10.

## V.    Worker's Claims for MRI With Contrast

**{31}** Next, Worker contends that it was error for the WCJ to deny her an MRI with contrast of her right knee, which Worker argues was contrary to the evidence as two medical professionals recommended it. Worker requested a finding that she was "entitled to an MRI of her right knee with gadolinium [or contrast] as recommended by Dr. Romanelli[.]" The WCJ denied Worker's claim. Worker argues the WCJ's denial of Worker's request for an MRI with contrast was erroneous, without support, and contrary to NMSA 1978, Section 52-1-49(A) (1990) because it was reasonably necessary. *See id.* (requiring employers to provide injured workers with "reasonable and necessary health care services"). As we explain, we hold that the WCJ's denial of Worker's request for the MRI is supported by substantial evidence.

**{32}** When Worker sought a second opinion from Dr. Romanelli, he recommended a "repeat MRI with intra-articular gadolinium" to "see the status of the soft tissues today and also to rule out an articular cartilage defect that may have been missed with the initial MRI." Dr. Patton testified that while a second MRI had been done, it was without contrast and it "would have been optimal for [Worker] to have [the MRI] with the contrast

as the follow-up" because "the contrast can kind of go under the nooks and crannies of the cartilage looking for any deficits." Contrary to Worker's characterization, Dr. Patton did not specifically recommend Worker receive the MRI with contrast, nor did he order one himself, though he was authorized to do so. Therefore, we hold that there was substantial evidence for the WCJ to conclude that an MRI with contrast was not medically and reasonably necessary.

## VI.     Denial of Reimbursement for Mental Health Treatment

**{33}**     Worker argues that the WCJ erred when he denied her reimbursement for mental health treatment she received from Robert Cravens, LPCC and Charlene Broock, MSW, LCSW, and limited medical benefits for her mental health treatments to one year. In this case, we cannot conclude that the WCJ erred when it denied Worker reimbursements for the treatment she received from Mr. Cravens and Ms. Broock as they were not authorized health-care providers.

**{34}**     Section 52-1-49(B) provides that "[t]he employer shall initially either select the health-care provider for the injured worker or permit the injured worker to make the selection." "[A]n injured worker's right to initially select a [health-care provider] occurs only by permission of the employer." *Silva v. Denco Sales Co.*, 2020-NMCA-012, ¶ 23, 456 P.3d 1117. "[U]nder the Act and associated regulations . . . if the employer permits the worker to make the initial [health-care provider] selection, it must provide written notice of its decision allowing the worker to do so." *Id.* (citing Section 52-1-49(B); 11.4.4.12(B)(2)(a) NMAC). "Without written notice from the employer, the worker has been given no right to select the initial [health-care provider], and so the initial [health-care provider] cannot be a selection by the worker." *Id.* The employer is not liable for medical expenses incurred by the worker outside of this procedure as they are unauthorized health-care providers. *See Beckwith v. Cactus Drilling Corp.*, 1972-NMCA-168, ¶ 38, 84 N.M. 565, 505 P.2d 1241 (denying medical benefits for treatment the worker incurred on his own when there was no evidence that the employers offered treatment was unreasonable or inadequate); *see also* 11.4.4.12.G(1) NMAC ("The [e]mployer shall be responsible for all reasonable and necessary medical services provided by an *authorized* [health-care provider] from the date the notice of change is effective." (emphasis added)); 11.4.4.12.G(2) NMAC ("The worker shall be responsible for any medical services rendered by an *unauthorized* [health-care provider]." (emphasis added)).

**{35}**     The WCJ concluded that "Worker sought mental health care outside the chain of authorization" and that Mr. Cravens and Ms. Broock were not authorized health-care providers. The record indicates that Worker did not follow the requisite procedures to obtain authorized treatment from Mr. Cravens and Ms. Broock. Worker testified that she sought out this treatment without requesting prior authorization, noting "with the way the insurance company was going, [I knew] that I had to do this . . . myself." Instead, Worker relies on *Trujillo v. Beaty Electric Co.*, 1978-NMCA-021, ¶ 30, 91 N.M. 533, 577 P.2d 431, in which this Court required employer to pay the worker's medical bills that were incurred by the worker. However, *Trujillo* is distinguishable and not applicable here

because the employer had notice of the worker's injuries but only made a "mere passive willingness" to furnish medical care and thus did not meet their statutory duty under the Act. *Id.* ¶ 18 (internal quotation marks and citation omitted). In this instance, we find nothing in the record, and Worker does not point us to anything, indicating Employer was aware of Worker's mental injuries, triggering its obligation to select a provider. Indeed, Dr. Swanda's review of Worker's medical records performed as part of his independent psychological examination of Worker reveals that the first reference to a mental injury in Worker's medical records was a note that she "was seen on 5/8/2017 by Robert Cravens, LPCC on [a] self-referral due to anxiety and depression that reportedly started with a 6-foot fall onto her knees in 2016." From the record before us, it appears Worker began treatment with Mr. Cravens and Ms. Broocks five months before she filed her complaint in this action, which is the first indication we find in the record that Worker claimed the May 2016 accident caused her to suffer depression and anxiety. *See Dewitt v. Rent-A-Center Inc.*, 2009-NMSC-032, ¶ 25, 146 N.M. 453, 212 P.3d 341 (holding that the employer did not fail to provide the worker with reasonable and necessary health-care services when the worker had the requisite information to contact the claims adjuster, but did not). In light of Worker's failure to comply with the requirements of Section 52-1-49 and the fact that Mr. Cravens and Ms. Broock were not authorized health-care providers, we find no error on the part of the WCJ in denying Worker's request for reimbursements as to those treatments.

{36}    Next, Worker contends that the WCJ erred in adopting Dr. Swanda's recommendation that Worker should only be afforded treatment for her mental injuries for a period of one year. Worker directs this Court to *Graham v. Presbyterian Hospital Center*, 1986-NMCA-064, 104 N.M. 490, 723 P.2d 259, for the proposition that district courts may not restrict future medical benefits. In *Graham*, this Court stated that "[o]nce a compensable injury is found, the [Act] grants, as a substantive right, necessary and reasonable future medical treatment to the injured worker. . . . The [district] court is without authority to limit or restrict in advance future medical benefits once a compensable injury is established." *Id.* ¶ 3 (citation omitted); *see Gearhart v. Eidson Metal Prods.*, 1979-NMCA-019, ¶ 5, 92 N.M. 763, 595 P.2d 401 ("[W]e are of the view that the continuing medical . . . attention for the injury cannot be terminated by the [district] court. The right created by statute is for a period continuing as long as medical . . . attention is reasonably necessary." (internal quotation marks omitted)). *Graham* and *Gearhart* both clarify the requirement of Section 52-1-49(A) that an employer shall provide the worker with reasonable and necessary health-care services, and "continuing as long as medical or related treatment is reasonably necessary."

{37}    In this case, the WCJ found that "Worker would benefit from the treatment recommended by the IME panel to help her *maintain* her mental health, and, this treatment is reasonable and necessary care for conditions related to the [May 2016 a]ccident." (Emphasis added.) The WCJ's finding incorporates Dr. Swanda's recommendation that Worker "receive up to [twelve] additional sessions of counseling" either at the continued rate of one session a month, or at longer intervals. We do not interpret the WCJ's finding to be a limitation or restriction on Worker's future mental health care; rather, it was an adoption of Dr. Swanda's recommendation and does not

prevent Worker from seeking reasonable and necessary health-care services as long as reasonably necessary. *See St. Clair v. Cnty. of Grant*, 1990-NMCA-087, ¶¶ 11, 14, 110 N.M. 543, 797 P.2d 993 ("[T]he district court has continuing jurisdiction to reopen a workers' compensation award. . . . Section 52-1-49 authorizes entry of a judgment directing the payment of a worker's reasonable and necessary future medical expenses and invests the [district] court with continuing jurisdiction to enforce such orders."). Therefore, we conclude that the WCJ did not err.

**CONCLUSION**

**{38}** For the foregoing reasons, we affirm.

**{39} IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**BRIANA H. ZAMORA, Judge**

**ZACHARY A. IVES, Judge**